HEINZ BINSAU, Plaintiff below, Appellant, v. GEOFFREY S. GARSTIN, ANN N. GARSTIN and MARY C. NIELDS, Defendants below, Appellees.

*(February* 15, 1962.)

SOUTHERLAND, Chief Justice, and WOLCOTT, Justice, and SHORT, Vice Chancellor, sitting.

*Richard J. Baker* for appellant.

*Samuel R. Russell, Jr.* (of Morford, Young and Conaway) for appellees Geoffrey S. Garstin and Ann N. Garstin; and *Edmund N. Carpenter, II* (of Richards, Layton and Finger) for appellee Mary C. Nields.

Supreme Court of the State of Delaware, No. 35, 1961.

SOUTHERLAND, C. J.:

This is an action by a servant against his employers for damages for personal injuries resulting from a fall from a roof on which he was working. Two charges of negligence are alleged: (1) that defendants failed to provide plaintiff with safe tools and equipment and a safe place to work; and (2) that defendants failed to warn plaintiff of the slippery condition of the roof where he was sent to work and from which he fell. At the conclusion of all the testimony the trial court held that there was no evidence of any negligence of the de-

fendants causing the accident, and directed a verdict for the defendants. Plaintiff appeals.

The principal question before us is whether plaintiff's proof, viewed in the light most favorable to him, was sufficient to justify a jury in finding negligence on the part of the defendants or any of them.

The facts are these:

The plaintiff Heinz Binsau has been employed since 1957 as a gardener and general handyman by Mr. and Mrs. Geoffrey S. Garstin, two the defendants. The Garstins own and live on an estate of some twenty-five acres (at the time of the accident somewhat larger) on the Kennett Pike, New Castle County. Mrs. Mary C. Nields, the third defendant, is Mrs. Garstin's mother. She also lives on the estate. These are three houses, one occupied by the Garstins, one by Mrs. Nields, and one by Binsau and his family.

Binsau is a German immigrant. While Mr. Garstin was in Germany, he arranged to employ Binsau at the Garstin estate, and sponsored Binsau's application for admission to the United States.

When Binsau first entered upon his duties, in March, 1957, his English was very limited, and Mr. Garstin, who speaks German, gave him almost all the orders. As time went on, Binsau's English improved, and at the time of the accident, seven months later, he was taking orders from Mrs. Garstin and Mrs. Nields as well. His duties took him in and about all three dwellings.

Some time in October, 1957, Mrs. Nields was apparently annoyed by the noise made by a branch (or branches) of a tree near her house scraping the roof. At all events, she spoke to Mr. Garstin about it, and Mr. Garstin told Binsau to go up on the roof and cut back the branches to a point about three feet from the roof. Mr. Garstin gave Binsau no detailed instructions except to suggest that he wear rubber-soled

shoes. Mr. Garstin did not concern himself with the matter of furnishing or selecting proper tools for the job. Binsau was supposed to do the best he could with whatever was available. Mr. Garstin testified, very frankly, that if before the accident he had known what he heard afterward about safety practices he would have insisted on better equipment to do the job. He said on his deposition: "I should have provided him with adequate safeguards and proper tools."

Binsau testified that Garstin told him to talk to Mrs. Nields the next morning and said that she would explain how she would like the branches trimmed. Binsau added:

"Then we talked over the tools we had and said we used to have the long-handled clippers, we have one extension ladder and a shorter ladder and the step-ladder, and there was another ladder."

Just what he meant by the phrase "used to have" is not clear; but he also testified that the ladders were too short for the roof.

The next morning Binsau talked with Mrs. Nields. He told her that it would be better to take off the whole branch than to trim it. Mrs. Nields said "No"; she wanted it trimmed three feet "over the roof". If he had cut the branch off he would have done it from a ladder standing against the trunk. He told Mrs. Nields: "We don't have the right equipment". Mrs. Nields said: "You go ahead and do the job anyway".

The house has two stories, with a peaked roof, and a little roofed porch in front.

Binsau got his tools together and "tried to trim from the roof gutter", but apparently could not reach far enough. Apparently he then tried putting a ladder against the porch roof. At all events he then got on the main roof to inspect it and came down again. He went back to the roof, taking "my tools and the clipper and a little scissor". He sat down on

the peak, straddling it, and cut some branches, apparently with the long-handled clippers. One branch was a little hard to cut. He stood up and turned his body and tried to cut. He slipped and fell. He did not know just how he came to slip, but he testified:

"I slipped with the right foot while I had more weight on the right side with the long-handled clipper, when I turned around I had more weight on my right foot."

He tried to catch the gutter and the tree but failed, and he fell to the ground and was injured.

At the end of all the testimony the trial court directed a verdict for the defendants on the ground that there was no proof that any negligence of the defendants was the proximate cause of the accident. So far as this holding concerns the second allegation of negligence, *i.e.*, failure to warn of a dangerous condition on the roof, it was clearly correct. An effort was made to show that the roof was slippery because of moss, but this failed. But so far as it concerns the first charge of negligence—failure to furnish proper tools and a safe place to work—we are compelled to take a different view.

■ The duties of the master to furnish to the servant a safe place to work and proper tools and equipment with which to work are two of the master's primary duties. *Thouron v. Acree, Del.,* 174 *A.* 2d 702, 705; *Louft v. C. & J. Pyle Co.,* 1 *Boyce* 192, 197, 75 *A.* 619; *Jemnienski v. Lobdell Car Wheel Co.,* 5 *Penn.* 385, 388, 63 *A.* 935; *Rex v. Pullman's Palace Car Co.,* 2 *Marv.* 337, 347, 43 *A.* 246.

■ In the instant case the evidence permits the inference that the defendants had not supplied the servant with adequate equipment for the task he was directed to do. Indeed, Mr. Garstin admitted as much. Binsau's testimony in effect is that he should have had a ladder sufficiently long to provide firm and steady support for his feet while he cut the branches; whereas, in fact, he was compelled to perform his duties from

a place inherently dangerous, *i.e.*, from the sloping sides of a peaked roof.

Not only so, but he was finally required to stand up to manipulate the long-handled clippers. The record does not disclose the thickness of the branch he was attempting to cut, but one may infer that it could not conveniently be cut with the clippers supplied. At all events, it is a reasonable inference that the use of this unwieldy instrument from such a precarious position was a very dangerous hazard, and was the cause of his fall. His testimony indicates as much. The trial court held in effect that the negligence of the defendants, if any, was not the cause of the injury. We think this was a question for the jury. It is entirely reasonable to believe that the accident would have been avoided if the employer had provided proper equipment, instead of directing Binsau to go upon the roof—a command repeated by Mrs. Nields. The ommission of the defendants to exercise such care and diligence for the servant's safety would thus become the real and proximate cause of the servant's injury. In *Sawyer v. Rumford Falls Paper Co.*, 90 *Me.* 354, 38 *A.* 318, an employee in a paper mill was directed to pull broken paper from a press. The lights had gone out, as frequently occurred. The paper broke in his hand and he fell backward. He tried to stop himself from falling, but his hand missed the rod and went between the rolls and he was injured. It was contended that the proximate cause of the injury was the breaking of the paper, but the court said:

"That the workman might be thrown from his proper position by the sudden giving way of the paper under the force applied to remove it, or in some similar way, was an occurrence which might reasonably have been anticipated, and regarded as likely to happen; but the injurious consequence of such an accident might have been avoided if the defendant had exercised reasonable care and diligence in providing sufficient means for lighting the room in the nighttime. The omission of the defendant to exercise such care, diligence,

and prudence would thus become the real, efficient, and proximate cause of the plaintiff's injury."

So here, it was for the jury to say whether the employer might have reasonably anticipated that an accident might result from directing the servant to perform a dangerous task that would have been unnecessary if proper equipment had been provided. If so, a finding that the master's negligence was the proximate cause of the accident would be justified.

Defendants argue that even if the evidence shows some negligence contributing to the accident, yet the verdict must be sustained because it clearly appears that plaintiff voluntarily assumed the risk of injury incident to working on the roof, or, alternatively, was guilty of contributory negligence.

As to assumption of risk, the law is settled that the servant, upon entering upon his employment, does not assume any risk arising out of the breach by the master of any of his primary duties. Nevertheless, if in the course of his employment he undertakes a dangerous task, and has an equal opportunity with the master to know and perceive the danger, he is ordinarily held to assume the risk of injury. But this rule applies with much less force if the work is undertaken by the servant at the express direction of the master. In such a situation the issue is almost always for the jury under proper instructions from the court. See the cases collected in the annotation to *Choctaw, etc., R. Co. v. Jones*, 77 *Ark.* 367, 92 *S. W.* 244, 4 *L. R. A., N. S.*, 837, 7 *Ann. Cas.* 430, Note at pp. 435-443. The annotator sums up the general rule of all these cases as follows:

"Where a servant is ordered by his master, or a superior servant, to perform a certain act, either within or without the scope of the servant's employment, and the danger incident to the performance of the act is known to the servant, if the risk is such that a prudent man would refuse to do the work, under the circumstances, because of the danger, then

the servant in obeying the orders of his master acts at his peril and assumes the risk incident to the undertaking; but where the probability of injury is such that the minds and judgment of prudent men might differ upon the certainty of its happening, and where the master insists, after objection by the servant, that the servant shall proceed with the work, then the servant has the right to rely upon the master's presumed superior knowledge, and in performing his master's order the servant does not assume the risk."

In *Van Duzen Gas, etc., Co. v. Schelies*, 61 *Ohio St.* 298, 55 *N. E.* 998, plaintiff was ordered by his foreman to adjust the shafting on a pump that was in close proximity to a circular saw. The employer had negligently failed to provide the saw with a fender or shield. The plaintiff knew of the danger; a short time before he had done substantially the same thing without accident. He obeyed the foreman; his clothing was caught by the saw and he was injured. The Supreme Court of Ohio sustained a verdict for plaintiff, saying:

"The clear result of the best-considered cases is that where an order is given a servant by his superior to do something within his employment, apparently dangerous, and in obeying he is injured, from the culpable fault of the master, he may recover, unless obedience to the order involved such obvious danger that no man of ordinary prudence would have obeyed it; and this is a question of fact for the jury to determine under proper instructions, and not of law for the court." The Court added:

"There is much reason in the rule that allows a favorable construction to be placed on the act of the servant done in obedience to the order of his superior, though involving danger. Obedience to orders given by a master becomes a habit with the servant. He obeys without much questioning the prudence of the order. It is expected that he will do so, and without such obedience the business of the master could not

be successfully conducted. It is, then, both reasonable and proper that the master should be held to a reasonable responsibility for what he orders his servants to do; and the conduct of a servant in obeying an order, under such circumstances, should not be too closely criticised by courts in administering the law".

These principles, we think, are applicable to this case. On the evidence a jury might reason as follows: Binsau was ordered to perform a dangerous task—the trimming of a tree with long-handled clippers from a position on a peaked roof. No inspection of the branches appears to have been made by the master. This method of trimming the tree was the result of the master's failure to discharge a primary duty he owed the servant—the duty of furnishing proper equipment, *i.e.*, ladders which would have afforded firm footing for the performance of the work. Binsau, realizing that there was danger, told Mrs. Nields that he lacked the proper tools. Upon her insistence he nevertheless undertook the work. The task was not so dangerous that no man of ordinary prudence would have undertaken it. And Brinsau's special position must be taken into account. Mr. Garstin said:

"Heinz Binsau had at that time worked for me about six months. Because he was new in this country and was trying very hard to please me he did everything I asked him to do without complaint even though the job may have been exceptionally difficult."

But Binsau was not unmindful of his own safety. He first climbed upon the roof and satisfied himself that it was dry. Only after this trip did he take his tools and proceed with the work. No doubt, when he rose to a standing position to make the difficult cut, he thought that the rubber-soled shoes, recommended by his employer, would give him a firm foothold. Upon the whole, he should not be blamed for attempting a dangerous piece of work, and he hence did not assume the risk. In such a manner the jury might reason.

We cannot say that such a finding would be as a matter of law unreasonable. Hence the issue was one for the jury.

What has been said upon the issue of assumption of risk is in great part applicable to the question of contributory negligence. Whether, when Binsau stood up to finish the trimming, he was guilty of lack of due care for his own safety was, under all the circumstances, for the jury.

There remains only one more point to be considered.

■ The defendant Mary C. Nields contends that even if the Garstin defendants could be held liable, yet she cannot be liable because she was not Binsau's employer. Her testimony was that Mr. Garstin wished Binsau to be responsible to him alone.

But other testimony permits the inference that Binsau took orders indifferently from all three defendants. Mr. Garstin said that he gave Binsau nearly all the orders at first, because of Binsau's lack of understanding of English, but as time went on Mrs. Garstin and Mrs. Nields also gave him things to do. Binsau testified to the same effect. Indeed, he assented to a suggestion that he regarded Mrs. Nields "as the boss of the whole place".

It seems clear that, as to Mrs. Nields' responsibility as an employer, there was an issue of fact for the jury. The most important test of the relationship of master and servant is that of control and direction. *Restatement*, Agency, 2d, § 220. Here the jury might find that the Garstins retained exclusive control, or that control was exercised jointly, because all parties were interested in the performance of the task, or that Binsau, for this particular task, was a lent employee under Mrs. Nields' direction. See 56 *C. J. S.* Master and Servant § 2, p. 33, and pp. 36-38.

Counsel for the Garstins sought below to adduce evidence to show that Mrs. Nields had, in law, a dower interest in the

estate, and carried some liability insurance on her home. He also suggests that in any event Mrs. Nields, as an occupant of real estate, owed a duty to a business invitee, such as Binsau, to keep the premises in repair.

All of this is predicated upon the assumption that plaintiff's case depends on a defective condition of the roof. As we have noted, the case on this point failed. And it failed because of plaintiff's own testimony. Hence the issue would appear to be out of the case, unless some new testimony be brought forward. In these circumstances, we see no reason to deal with any questions of liability to invitees of the owner or occupant of real estate.

For the reasons heretofore set forth, the judgment below must be reversed, and the cause remanded for a new trial.